**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| ROUTE APP, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ORDERPROTECTION.COM, INC., a Delaware corporation; JULIAN WILSON, an individual; JOHN CLARK, an individual; MATTHEW J. LEFRANDT, an individual; JOHN PERKINS, an individual; TANNER B. CHATTERLEY, an individual; and LUKE STEELE, an individual.<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:23-cv-00606-DAK-CMR<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Cecilia M. Romero |

This matter is before the court on Defendants' Motion for Summary Judgment [ECF No. 110] and Plaintiff's Motion for Partial Summary Judgment [ECF No. 116]. On May 13, 2026, the court held a hearing on the motions. At the hearing, Plaintiff was represented by David L. Mortensen, Brandon T. Christensen and Charles Dennis Morris, and Defendant was represented by Matthew L. Lalli, Ryan Samuel Alba, Natalie Page Beal, and Troy J. Aramburu. The court took the motion under advisement. After carefully considering the memoranda filed by the parties and the law and facts pertaining to the motion, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Plaintiff Route App, Inc., is one of the first and only legally compliant post-purchase shipping insurance providers. Route offers a suite of services to assist merchants in improving their customer experience. Over the past six years Route has expended millions of dollars

developing its business. Shortly after its founding Route hired Defendants Clark, Lefrandt, Perkins and Chatterley to help build its business. Route later hired Defendant Steele as a product support specialist (collectively, "Employee Defendants"). Route requires its employees to sign confidentiality, nonsolicitation and other similar agreements, including a Confidential Information and Invention Assignment Agreement ("CIIA"), a Nondisclosure Agreement ("NDA"), a Non-competition, Confidentiality, and Non-Solicitation Agreement ("Noncompete Agreement"), and a Release and Waiver Agreement ("Separation Agreement") (collectively, "Agreements").

The CIIA defines confidential Information as comprising several categories of information including trade secrets, ideas, processes, research, marketing and selling, business plans, financial information, methods of conducting business, customer lists, customer names, customer needs or desires with respect to the types of products or services offered by Route, proposals, contracts, the type and quantity of products and services provided or sought to be provided to customers and protentional customers of Route, information regarding Route's business partners, personnel, employees, compensation and, employee skills. The NDA similarly defines Route's confidential information as including all information that relates to Route, its products or services, its business ventures or activities, or which relates to Route's research, development, customers, innovations, prototypes, business plans, business contacts or finances. The CIIA also prohibits employees, during their employment and for one year after, from "as an officer, director, employee, consultant, owner, partner, or in any other capacity… (1) soliciting Route's employees, consultants or independent contractors; or (2) soliciting Route's Customers or Potential Customers."

Route's Separation Agreement requires former Route employees to affirm their

obligations under the CIIA and NDA and to not disparage Route or its affiliated parties. The Noncompete Agreement provides that former employees agree not to: (1) compete with Route "within Utah and Salt Lake City County" for 12 months after their employment; or solicit Route's employees, agents, contractors, customers, or clients "served by [Route] during the employment relationship."

All the Employee Defendants signed CIIAs and NDAs. Additionally, Defendants Chatterley and Perkins signed Separation Agreements and Defendant Steele signed a Noncompete Agreement. During their employment at Route, Employee Defendants helped develop and acquired access to some of Route's confidential and trade secret information.

Defendant Wilson is the co-founder of Dose of Roses, a now defunct floral and gift company. Lefrandt, at the time an account executive with Route, signed Dose of Roses as a client. In August of 2020, Dose of Roses became a customer of Route. As a new customer, an employee of Dose of Roses created an account to access Route's merchant portal. Creation of the account required that Dose of Roses accept and agree to Route's Terms and Conditions of use. After creation of the merchant account, Wilson, as owner of Dose of Roses, personally logged into the merchant portal. At each login there was a message stating that by clicking continue the user agreed to Route's Terms and Conditions, which, among other things, precluded a user from using Route's confidential and trade secret information to create a competing company or product.

In August of 2020, Lefrandt's employment was terminated by Route. Shortly thereafter, Lefrandt and Wilson formed a competing shipping protection company, Defendant OrderProtection.com, Inc. ("OrderProtection"). Over the next several years, Defendants Clark, Perkins, Chatterley and Steele left Route's employ and went to work for OrderProtection.

On September 5, 2023, Route filed the instant lawsuit against Defendants for breach of contract and misappropriation of trade secrets in violation of the Defend Trade Secrets Act 18 U.S.C. § 1836 and Utah Code § 13-24-1. Defendants filed a motion seeking summary judgment on all of Route's causes of action. Route moved for partial summary judgment on each of its breach of contract claims and requests a permanent injunction enjoining certain of the Defendants from further breach of their Agreements.

**STANDARD OF REVIEW**

"Summary judgement is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Hertz v. Luzenac Grp.,* 576 F.3d 1103, 1108 (10th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). The moving party "bears the initial burden to show the absence of a genuine issue of material fact, and, if successful, the burden then shifts to the nonmovants to set forth specific facts showing that there is a genuine issue for trial." *Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 107 F.4th 1121, 1131 (10th Cir. 2024) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)) (internal quotation marks omitted). In examining the evidence, the court "draw[s] reasonable inferences therefrom in the light most favorable to the non-moving party." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003). "But 'mere speculation, conjecture, or surmise' cannot defeat summary judgment, because '[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings.'" *Double Eagle Alloys, Inc. v. Hooper*, 134 F. 4th 1078, 1087 (quoting *Bones v. Honeywell Int'l., Inc.,* 366 F.3d 869, 875 (10th Cir. 2004)).

**DISCUSSION**

***Trade Secrets***

Under both the Defend Trade Secrets Act ("DTSA") and the Utah Uniform Trade Secret Act ("UUTSA") a claim for misappropriation of trade secrets requires a plaintiff to "demonstrate (1) the existence of a trade secret, (2) the trade secret's misappropriation." *Double Eagle Alloys*, 134 F.4th at 1087 (quoting *dmarcian, Inc. v. dmarcian Eur. BV,* 60 F.4th 119, 141 (4th Cir. 2023)); *see also Gen. Water Techs. Inc. v. Van Zweden*, 2022 UT App 90, ¶ 34, 515 P.3d 956, 966. Both statutes define a trade secret as information that (1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information" and (2) is the subject of "reasonable measures to keep such information secret." 18 U.S.C. § 1836 (3), *see also* Utah Code § 13-24-2 (4). Moreover, a plaintiff "must identify the trade secrets and carry the burden of showing they exists." *InteliClear, LLC v. ETC Glob. Holdings, Inc.,* 978 F.3d 653, 658 (9th Cir. 2020); *see also Gen. Water Techs. Inc.,* 2022 UT App 90, ¶ 35, 515 P.3d 956, 966.

Defendants argue that misappropriation of trade secrets fails as a matter of law because: (1) Route's evidence of the existence of any trade secret is impermissibly broad and vague, (2) the features broadly described as trade secrets are publicly available and therefore do not qualify as trade secrets, and (3) even assuming Route has properly identified trade secrets, Route has not provided evidence that OrderProtection, misappropriated or used Route's trade secrets.

*Particularity of Trade Secrets*

"For particularity, the plaintiff 'must clearly refer to tangible trade secret material instead of referring to a system which *potentially* qualifies for trade secret protection.'" *Double Eagle Alloys*, 134 F.4th at 1089 (quoting *InteliClear*, 978 F.3d at 658). "The plaintiff should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of

general knowledge in the trade or of special knowledge of those persons skilled in the trade." *InteliClear,* 978 F.3d at 658. '"Long lists of general areas of information containing unidentified trade secrets, 'catchall phrases,' and 'categories of trade secrets' that the plaintiff intends to pursue at trial fail to identify the trade secret with sufficient particularity." *Double Eagle Alloys*, 134 F.4th at 1089 (quoting *InteliClear*, 978 F.3d at 658). Additionally, "a plaintiff must do more than identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *IDX Systems Corp. v. Epic Sys. Corp.,* 285 F.3d 581, 584 (7th Cir. 2002).

Route has alleged a long list of categories it considers to be trade secrets. However, it limited its argument to its pricing and revenue sharing formula, merchant data and its merchant portal. Accordingly, the court limits its analysis to these categories where Route developed arguments attempting to demonstrate a protectable trade secret under DTSA or UUTSA.

*Pricing Formula*

Route contends its pricing formulas are trade secrets. Route produced its pricing formulas which it maintains were developed after thousands of hours and millions of dollars of research, development and user feedback. The formulas allow Route to determine, among other things, what categories of shipping insurance are profitable or unprofitable. For example, Route found shipping insurance on luxury goods is typically not profitable but shipping insurance on perishable goods can be profitable under certain specific conditions identified by Route over years of trial and error. Route's pricing models consider attachment rates, claim approval rates, loss ratios, average order value, opt-in opt-out attachment methods, total order volume, average premium, revenue sharing, and cost per claim. All this information is used to determine the specific insurance pricing for each merchant.

Route also argues that its "Merchant Incentives" is a trade secret. A Merchant Incentive is the portion of a customer's shipping insurance premium that the merchant collects and remits to Route and, at the end of the month, Route calculates and agrees to pay the merchant. The amount differs from merchant to merchant. Route contends it developed a formula, contained in ROUTE-0009782, that allows it to determine effective revenue sharing agreements based on deals with thousands of merchants and millions of claims, Route is able to forecast a claim rate. The claim rate along with Route's "database and millions of data points" is then used to determine the appropriate revenue share with each merchant.

Defendant argues that Route has failed to identify its alleged pricing model trade secret with sufficient particularity. The court disagrees. "[F]or one competitor to have access to another competitor's internal financial calculations" is "a paradigmatic example of a trade secret." *USA Power, LLC v. PacifiCorp*, 2016 UT 20 ¶ 69, 372 P.2d 629, 655. Route has identified proprietary pricing and revenue sharing methodology used to generate merchant specific pricing proposals, including the variables and calculations used to assess risk and allocate revenue. This description is sufficiently definite to distinguish the alleged trade secret from general industry knowledge and to place Defendant on notice of the information at issue. Like the plaintiff in *InteliClear,* Route has identified aspects of its pricing model to "create a triable issue of fact." 978 F.3d at 659.

Additionally, Route has presented evidence that the alleged pricing and revenue sharing information was maintained in a restricted access data environment and was available only to authorized users. Route further presents evidence that the Defendants executed confidentiality agreements prohibiting disclosure or unauthorized use of the information. "Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required." *AvidAir*

*Helicopter Supply, Inc. v. Rolls-Royce Corp.,* 663 F.3d 966, 974 (8th Cir. 2011). The measures used by Route are the type courts routinely recognize as reasonable efforts to maintain secrecy. *See John Bean Technologies Corp. v. B GSE Group, LLC,* 480 F. Supp. 3d 1274, 1299 (D. Utah 2020) (finding plaintiff that took "practical measures to maintain the secrecy of its trade secrets" was not required "to prove it could do nothing more to protect its trade secrets."); *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 521 (9th Cir. 1993) (requiring employees to sign confidentiality agreements was a reasonable step to secure trade secrets).

Defendants also argue that Route's pricing is publicly available and therefore cannot be a trade secret. For information to qualify as a trade secret it must not be '"generally known or readily ascertainable.'" *John Bean Technologies,* 480 F. Supp. 3d at 1299 (quoting *USA Power,* 2016 UT 20 ¶ 68, 372 P.3d 629, 654. Whether information is readily ascertainable is determined by "the ease or difficulty with which the information could be properly acquired or duplicated by others." *USA Power,* 2016 UT 20 ¶ 59, 372 P.3d 629, 652. Defendants argue that any member of the public can go to Route's website and determine what its shipping insurance premium is for any of its featured merchants. Therefore, Route's pricing methodology is readily ascertainable.

However, the ability to observe a single price offered to a particular customer does not necessarily reveal the proprietary methodology used to generate that price. Route has presented evidence that its pricing model incorporates multiple confidential variables, merchant specific data and internal calculations that are not disclosed through the quoting process. Accordingly, a genuine dispute of material fact remains regarding whether the alleged pricing model constitutes a trade secret.

*Merchant Data*

Route next argues that its merchant data is a trade secret, including the identity of its

customers, their strategic value to Route and their commercial needs and other non-public information developed through Route's business relationships. Defendants argue that such information is not secret because merchants can be identified through commercially available data aggregation tools that reveal businesses using Route's application and because Route publicly identifies certain customers on its website.

Defendants have not established as a matter of law that Route's merchants' data is publicly available. While Defendants may be able to identify some merchants through public sources, the existence of publicly available fragments of information does not necessarily destroy trade secret protection for a compilation of information. "Courts have found with near uniformity that lists compiling customers, pricing, product, or supplier information constitute protectable trade secrets, even where the information they contain is publicly available." *Hanks v. Anderson,* 2024 WL 4092949, at *11 n.103 (D. Utah 2024) (quoting *IHS Global Limited v. Trade Data Monitor, LLC,* 2021 WL 2134909, at *7 (D.S.C. 2021)). Moreover, "[a] customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available." *Hertz v. Luzenac Group*, 576 F.3d 1103, 1114) (10th Cir. 2009). The relevant inquiry is whether the compilation itself is readily ascertainable and derived value from its secrecy.

Here, Route's alleged trade secret extends beyond the mere identity of its merchants. Route has presented evidence that its merchants' data includes information concerning each merchant's business characteristics, transaction volume, loss history, pricing arrangements, revenue sharing terms, purchasing behavior and strategic value to Route's business. A reasonable juror could conclude that this information reflects years of business development and data collection and provides a competitive advantage not obtainable from publicly available

sources.

Further, Route has produced evidence that the merchant data was disclosed to Defendants only pursuant to written confidentiality agreements. Notably Defendants expressly agreed that the information constituted confidential information and agreed not to disclose or use it except as permitted by the parties' Agreements. While such agreements do not, by themselves, establish trade secret status, they are substantial evidence that Route treated the information as confidential and took reasonable measures to preserve its secrecy. Defendants' contractual acknowledgement that the information was confidential also undermines their contention that the information was generally known or freely available in the marketplace.

Moreover, even if certain merchant identities could be discovered through public sources, Defendants have not demonstrated that the associated merchant specific data, commercial intelligence, pricing information, or strategic analyses could likewise be obtained through proper means. At most, the record presents a factual dispute concerning the extent to which portions of the information may have been publicly available. Such disputes are improper for resolution on summary judgment.

*Merchant Portal*

Finally, Route argues that its merchant portal is a trade secret. Defendants contend that the Merchant Portal cannot constitute a trade secret because its functions were visible to thousands of merchants and, in part, on Route's public website. Route, however, has presented evidence that the portal was password protected and users were subject to confidentiality and use restrictions. Disclosure to numerous authorized users subject to confidentiality obligations does not necessarily destroy secrecy. *See Envirotech Corp. v. Callahan*, 872 P.2d 487, 495 (Utah Ct. App. 1994).

Route has produced evidence identifying particular portal functions and workflows, including its claim resolution process from intake through payment, requests for additional information, or denial, its use of order and claims analytics within that process, and its Resolve Insights and Engage functions. Route's witness testified that these features resulted from merchant communications, collected data, trial and error and that this work provided competitors with knowledge concerning which functions merchants valued and which increased sales or retention. Although some user-facing features were publicly observable, Route maintains that the underlying arrangement, operation and data-informed development were not.

The evidence is not so specific or one-sided as to establish that the merchant portal is a trade secret as a mater of law. But viewed in Route's favor, it sufficiently identifies particular functions and workflows to avoid treating Route's claim as merely an assertion that the portal as a whole is secret. Route also presents evidence that Wilson supplied his portal credentials to OrderProtection's developers and that OrderProtection subsequently implemented similar functionality. A reasonable juror could infer improper acquisition and use or not. As with Route's claims relating to pricing and merchant data, those competing inferences cannot be resolved on summary judgment.

*Misappropriation*

Finally, Defendants argue that Route has not provided evidence that Defendants have misappropriated its trade secrets. The record, however, contains substantial evidence from which a reasonable juror could conclude otherwise. Specifically, Route alleges that:

- Wilson sent his Route Merchant Portal login credentials to OrderProtection's software developers, who were developing OrderProtection's merchant portal.
- Lefrandt told OrderProtection the names of Route's largest merchants, shared financial information regarding Route's merchants, opt-out rates and repeatedly solicited Route's merchants using variations of the pitch "remember me from Route?"
- Clark assisted OrderProtection in the formation of its software, resolving and addressing

the "exact same problems as early [R]oute days."

- Upon his arrival at OrderProtection, Steele "slap[ped] down a list of every brand [OrderProtection] need[ed] to take from Route."

A reasonable juror could infer from this evidence that Defendants acquired, disclosed or used Route's trade secrets without authorization and in violation of their contractual obligations. Additionally, Defendants' alternative explanation – that Defendants independently developed its products and business strategies – merely presents a competing factual narrative. The existence of competing inferences regarding the source of Defendants' information and the way their business was developed underscores, rather than eliminates, the existence of genuine disputes of material fact.

Moreover, direct evidence of misappropriation is uncommon because "corporations rarely keep direct evidence of their [misappropriation] ready for another party to discover." *Hammerton, Inc. v. Heisterman,* 2008 WL 2004327, at *9 (D. Utah May 9, 2008) (quoting *Stratienko v. Cordis Corp.,* 429 F.3d 592, 600 (6th Cir. 2005)). "[A] plaintiff may prove use of its trade secrets by showing (1) access by the defendant to the trade secret and (2) similarity in the respective designs or products of the defendant and the trade secret owner." *Id.* Here, the combination of Defendants' access to Route's confidential information, the alleged disclosure of merchant specific data, the sharing of portal credentials, and the Defendants' subsequent development of a competing product creates more than sufficient evidence from which a reasonable juror could find misappropriation. Accordingly, Defendants' motion for summary judgment on Route's trade secret claims is denied.

**Breach of Contract and Terms and Conditions**

In addition to its trade secret claims, Route brought separate breach of contract claims namely: (1) breach of Route's Terms and Conditions of Use ("T&C") against Defendant Wilson;

(2) breach of the CIIAs between Route and Defendants Lefrandt, Clark, Perkins, Chatterley and Steele; (3) breach of the NDAs between Route and Defendants Lefrandt, Clark, Perkins, Chatterley and Steele; (4) breach of the Separation Agreements between Route and Defendants Chatterley and Perkins; and (5) breach of the Noncompete Agreement between Route and Defendant Steele. The parties cross-move for summary judgment. Route seeks partial summary judgment that the Employee Defendants and Wilson breached their respective contract obligations. Defendants seek summary judgment on Route's contract claims in their entirety.

Under Utah law, which governs each of the contracts entered into by the Employee Defendants, "[t]he elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Blair v. Axiom Design, L.L.C.,* 2001 UT 20, ¶14, 20 P.3d 388, 392. Delaware law, which governs Wilson's T&C, similarly requires the existence of a contractual obligation, breach, and resulting damages. *See VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del. 2003). The parties do not materially dispute the existence of the Employee Defendants' agreements or identify any failure by Route to perform its obligations under them. The principal dispute concerns breach and whether the alleged breaches caused Route compensable injury. Because Wilson disputes that he is bound by the T&C, the court addresses his arguments first and then considers the evidence pertaining to the Employee Defendants.

*Wilson*

Wilson argues that Route's T&C are unenforceable against him because he never personally agreed to them. Although Dose of Roses–a now defunct company formerly co-owned by Wilson–originally created the merchant portal account through one of its employees, Wilson later accessed the merchant portal using Dose of Roses's credentials. Wilson characterizes the

agreement he encountered as a browsewrap agreement and argues that the login screen did not provide sufficient notice that signing into the portal constituted assent to Route's T&C.

The court disagrees with Wilson's characterization. A browsewrap agreement generally makes contractual terms available through a hyperlink but does not require the user to take any affirmative action demonstrating assent. *Heuberger*, 2022 WL 2316377, at *3. Assent is instead inferred from continued use of the website. A sign-in-wrap agreement, by contrast, advises the user that taking an affirmative action, such as creating an account, signing in, or continuing, constitutes assent to hyperlinked terms. *Id.*

The interface Wilson encountered falls within the latter category. The login screen stated, "Welcome to Route. Please sign in to your merchant portal," followed by the "Sign In" button. Thus, the T&C were not merely posted somewhere on Route's website with assent inferred from Wilson's continued use. The interface expressly connected the act of proceeding into the portal with agreement to the Terms of Service. The court therefore concludes that Wilson encountered a sign-in-wrap agreement.

*Heuberger* is particularly instructive because it involved the same plaintiff and the same T&C. There, a user creating a Route merchant account was prompted to enter an email address, name, phone number, and password. Beneath those fields appeared an option for existing users to "login here," followed immediately by the statement, "By continuing you are agreeing to our Terms of Service and Privacy Policy," both of which appeared as blue hyperlinks. The court concluded that the interface provided reasonably conspicuous notice that proceeding constituted assent.

Wilson's interface was not identical. Because the Dose of Roses's account already existed, Wilson encountered a login screen rather than an account creation screen. The button

states "Sign In" rather than "Continue," and the hyperlinks to the Terms of Service and Privacy Policy appeared in black rather than blue. Moreover, the "Forgot Email" and "Forgot Password" links appearing below the Sign In button were blue, which Wilson argues made the black Terms of Service and Privacy Policy less readily identifiable as hyperlinks.

These differences make the interface somewhat less conspicuous than the one considered in *Heuberger*, but they do not change the result. Most importantly, the operative notice itself was prominently situated within the login sequence. It appeared directly beneath the fields in which Wilson entered his credentials and immediately above the Sign In button he was required to select to access the portal. Further, the language did not merely direct Wilson to terms located elsewhere on the website. It expressly informed him that "By continuing" he was "agreeing to the Terms of Service." Although the button stated "Sign In' rather than "Continue" signing in was the affirmative act by which Wilson continued beyond the login screen and entered the restricted merchant portal.

*Smith v. Whaleco Inc.,* 741 F. Supp. 3d 1104 (W.D. Okla. 2024) does not compel a contrary conclusion. *Smith* considered the interface as a whole and found the notice insufficiently conspicuous because it appeared in small, light-gray text against a white background, was separated from the prominent "Continue" button, and competed with several intervening social-media sign-in options. *Id*. at 1108-11. Here, even accounting for the black hyperlinks, the relationship between the notice and the action manifesting assent was considerably more direct than *Smith*. Moreover, the context in which the respective users encountered the agreements provides a further distinction. *Smith* involved members of the general public accessing a consumer retail application. Wilson was a cofounder of Dose of Roses accessing a restricted merchant portal made available as part of a commercial relationship

with Route. As *Heuberger* recognized, a user's sophistication and familiarity with e-commerce may further support a finding of reasonable notice. 2022 WL 2316377, at *6. Wilson's business experience and deliberate access to Route's restricted merchant portal therefore reinforce the conclusion that he received reasonable notice of the T&C and assented to be bound by the Terms of Service.

Wilson next argues that the T&C are unenforceable because they are unconscionable and unsupported by consideration. Neither argument is persuasive.

Under Delaware law, unconscionability generally requires an absence of meaningful choice together with contractual terms that are unreasonably favorable to one party, considering the totality of the circumstances at the time of contracting. *See Tulowitzki v. Alt. Richfield Co.,* 396 A.2d 956, 960 (Del. 1978); *James v. National Financial, LLC,* 132 A.3d 799, 813-15 (Del. Ch. 2016). "A finding of unconscionability generally requires '"the taking of an unfair advantage by one party over the other.'" *James,* 132 A.3d at 814 (quoting *Tulowitzki,* 396 A.2d at 960). Furthermore, a "contract is substantively unconscionable if 'a bargain on terms [is] so extreme…according to the mores and business practices of the time and place."' *Heuberger,* 2022 WL 2316377, at *5 (quoting *James*, 132 A.3d at 814). The doctrine is applied cautiously and requires more than standardized or nonnegotiable terms. *James,* 132 A.3d at 814.

Wilson emphasizes that Route uses the same nonnegotiable T&C for its merchants and that certain provisions prohibit individuals who access the merchant portal from creating a similar business or competing with Route. To the extent those provisions operate as restrictive covenants, their breadth, including the persons covered, duration, geographic scope, and relationship to Route's legitimate business interests, may bear on whether the particular restriction are enforceable. But Wilson has not demonstrated that these provisions render the

T&C as a whole unconscionable. Wilson is a sophisticated businessperson accessing a restricted portal in connection with Dose of Roses's commercial relationship with Route, and there is no evidence Route concealed the terms or prevented him from reviewing them. Accordingly, although the enforceability and scope of any particular restrictive covenant may present a separate question, Wilson has not established that the T&C are unconscionable in their entirety.

Wilson separately argues that the T&C are void for lack of consideration. Specifically, relying on Utah law, Wilson contends that a noncompetition provision must be supported by consideration. This argument fails for two reasons. First, the T&C expressly provide that Delaware law governs. Wilson does not challenge the choice of law provision or otherwise explain why Utah law should apply here. Second, under Delaware law, a restrictive covenant must be supported by consideration, but separate consideration is not required for each provision of an otherwise supported agreement. "Consideration requires that each party to a contract convey a benefit or incur a legal detriment, such that the exchange is 'bargained for.' If this requirement is met, 'there is no additional requirement of [] equivalence in the values exchanged.'" *Cox Communs., Inc. v. T-Mobile US, Inc.,* 273 A.3d 752, 764 (Del. 2022).

Here, Route provided access to its restricted merchant portal subject to the user's agreement with its T&C. Wilson was not independently entitled to access the portal free of the conditions Route placed on its use. By proceeding through the sign-in process, Wilson obtained access to the portal and the information and functionality available through it. In exchange, he agreed to comply with the T&C governing that access. Route's provision of access to its merchant portal therefore supplied consideration for Wilson's agreement to abide by those terms.

Wilson next argues that the T&C are unenforceable because several restrictions lack temporal and geographic limitations and because the twenty-four month nationwide

noncompetition and nonsolicitation provisions are themselves overbroad. Relying on *TopstepTrader, LLC v. OneUp Trader, LLC,* 2017 WL 27988397, at *4 (N.D. Ill. June 28, 2017), Wilson contends that the provisions operate as unreasonable restraints on competition.

The court disagrees. *TopstepTrader* applied Illinois law. Delaware law governs here. "In Delaware, 'the reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect.'" *O'Leary v. Telecom Resources Services, LLC,* 2011 WL 379300, at *5 (Super. Ct. Jan. 14, 2011) (quoting *Weichert Co. of Pennsylvania v. Young,* 2007 WL 4372823, at *3 (Del. Ch. 2007)). Route operates its internet-based shipping protection business nationwide, and its noncompetition provision is correspondingly limited to the United States. The nonsolicitation provision is likewise limited to Route's customers, employees, and consultants. Nor does Delaware law impose a categorical one-year limit on restrictive covenants. Two-year restrictions may be reasonable depending on the circumstances. *See Weichert Co. of Penn.*, 2007 WL 4372823, at *3 ("Covenants of two-years' duration are consistently held to be reasonable.").

More importantly, Wilson's argument improperly treats all the T&C as noncompetition covenants. Separate provisions prohibit users from providing Route's services or content to third parties and from accessing or using those services or content "to develop or have a third-party develop a product or service that is similar or competitive to the Services." Those provisions restrict the use and disclosure of Route's services and proprietary content. They do not prohibit competition generally. Wilson therefore has not shown that the temporal and geographic limitations applicable to noncompetition covenants render those independent provisions unenforceable.

Moreover, the T&C contain a severability clause. Thus, even assuming the separate

noncompetition or nonsolicitation provisions are unenforceable, Wilson has not shown that any defect in those provisions would invalidate the T&C as a whole or the independent restrictions on the use and disclosure of Route's services and content. Accordingly, Wilson has not established that the T&C are unenforceable, and the court rejects his argument that those provisions cannot bind him.

The T&C impose several restrictions relevant here. Among other things, a registered user may not authorize a third party to access or use Route's services on the user's behalf and is responsible for maintaining the confidentiality of his user credentials. The agreement further prohibits using Route's Services of Content "to develop, or have a third party develop, a product or service that is similar or competitive to the Services." The undisputed evidence establishes that Wilson provided his Route login credentials to a third party developer working on OrderProtection while OrderProtection was developing a competing shipping protection product. That conduct falls within both restrictions. Wilson permitted a third party to access Route's services through his account and did so in connection with the development of a product directly competitive with Route. Accordingly, Route has established breach as a matter of law.

Route additionally contends that Wilson violated provisions prohibiting solicitation, scraping or crawling Route's services, copying or reverse engineering Route's products, and disparaging Route. Because Wilson's violation of the third party access and competing product provisions independently establishes breach, the court need not determine whether the undisputed evidence also establishes breach of each additional provision.

*Confidential Information and the Common Calling Doctrine.*

The Employee Defendants' Agreements generally prohibit the unauthorized use or disclosure of Route's confidential information. Although the agreements vary somewhat,

confidential information includes, among other things, Route's business plans, pricing, margins, discount, pricing and billing policies, and information regarding customer lists, names, representatives, and their needs and desires.

Defendants contend the contract claims fail because the Employee Defendants did not take Route's documents or electronic data and instead used only general knowledge, skills, and experience acquired during their employment.

Defendants also invoke Utah's common calling doctrine. Under Utah law, a restrictive covenant not to compete must be "carefully drawn to protect the legitimate interest of the employer" and may not be used merely to prevent a former employee from engaging in a common calling. *Robbins v. Finlay*, 645 P.2d 623, 627-28 (Utah 1982). Thus, an employer generally may not restrict a former employee's use of the knowledge, skill and experience acquired through employment. *Id.* But *Robbins* also recognizes an employer's legitimate interest in protecting proprietary information developed through its own effort and expense, including customer information and leads. *Id*. at 626-28. Likewise, an employer may enforce a reasonable restrictive covenant to protect legitimate interests such as goodwill, particularly where the employee's responsibilities and customer relationships materially contributed to that goodwill. *See System Concepts, Inc. v. Dixon*, 669 P.2d 421 (Utah 1983).

The distinction is therefore between an employee's general marketable skills and experience and information or relationships in which the former employer possesses a legitimate protectable interest. The common calling doctrine does not categorically invalidate contractual restrictions merely because they affect a former employee's ability to compete.

That distinction controls here. Route cannot prevent the Employee Defendants from using general sales techniques, product development expertise, industry knowledge or other skills

merely because they acquired them while working for Route. The fact that an employee first learned the shipping protection industry at Route and later performed similar work for OrderProtection does not, standing alone, establish breach. But neither does the common calling doctrine permit a former employee to use particular information that he expressly agreed to keep confidential. Information concerning a specific merchant's revenue, pricing arrangements, dissatisfaction with Route, needs or other nonpublic aspects of its relationship with Route is materially different from generalized industry knowledge or expertise.

Defendants' emphasis on the absence of evidence that the Employee Defendants physically removed Route's documents does not alter that distinction. The Agreements prohibit the unauthorized use or disclosure of information, not merely the removal of documents. Therefore, the relevant inquiry is not whether an employee remembered information or retained it in physical form, but whether the particular information allegedly used constituted general knowledge and experience the employee remained free to use or Route-specific information protected by the applicable agreement.

The court therefore considers the evidence pertaining to each Employee Defendant.

*Lefrandt*

Lefrandt began working for Route in May 2019 as its first enterprise account executive and remained there until August 26, 2020. His responsibilities included working with large merchants and prospective merchants, participating on Route's product steering committee, providing merchant feedback to Route's engineering team, assisting with Route's marketing, and developing Route's original sales script. Through these responsibilities, Lefrandt learned information concerning Route's merchants, pricing, revenue sharing arrangements, claims and conversion rates, and merchant experience and preferences.

The undisputed evidence establishes that Lefrandt subsequently used information protected by his confidentiality agreement for OrderProtection's benefit. Lefrandt testified that he knew which high volume Route customers had been dissatisfied with Route and why. He further testified that he had a list of high volume customers that were essentially dissatisfied with their initial experience with Route and explained that those experiences informed his efforts to build a competing business.

Lefrandt's subsequent communications with former Route customers provided additional evidence that he remembered from his time at Route that "there was a revenue share deal that we just couldn't make work," and immediately contrasted that unsuccessful arrangement with OrderProtection's allegedly more generous terms. In another communication, Lefrandt solicited a Route customer by invoking his knowledge of its history with Route and problems concerning Route's service level windows and customer experience before promoting OrderProtection's alleged superior service.

Defendants emphasize that the identities of Route's merchants could be obtained through public or third party sources. Indeed, Lefrandt testified that he sought from another Route employee a customer list obtained through BuiltWith so that OrderProtection could contact Route customers. But even assuming some customer identities were independently ascertainable, there is a distinction between a merchant's identity and nonpublic information concerning that merchant's relationship with Route, dissatisfaction, needs, and pricing arrangements. The latter categories fall within the CIIA's express protection of customer information, including customers' "needs or desires."

Nor does Defendants' characterization of this information as merely Lefrandt's personal knowledge create a genuine factual dispute. General knowledge that merchants prefer favorable

revenue sharing arrangements or satisfactory customer service is materially different from knowledge that a particular Route merchant was dissatisfied, or that Route had been unable to reach an acceptable revenue sharing arrangement with that merchant. And confidential information does not cease to be confidential merely because Lefrandt retained it in memory rather than in documentary form. Accordingly, Route is entitled to partial summary judgment that Lefrandt breached his confidentiality obligations.

Route also alleges that Lefrandt violated his one-year nonsolicitation provision. Lefrandt's employment ended August 26, 2020, making the restriction applicable through August 26, 2021. Route has presented evidence that Lefrandt solicited its customers and former employees, but some identified solicitations occurred after the restriction expired or after the employees had left Route's employ. Other evidence of solicitation is undated. The record therefore does not establish as a matter of law whether all of the relevant solicitation occurred within or outside the restricted period. Route's motion is therefore denied as to breach of Lefrandt's nonsolicitation provision.

*Chatterley*

The undisputed evidence likewise establishes that Chatterley breached his confidentiality obligations. The evidence concerning Vapor Authority is particularly clear. Chatterley admitted that Vapor Authority was a Route customer and that he knew the merchant through his work at Route. While OrderProtection was pursing Vapor Authority's business, Chatterley identified the merchant as an approximately "$40,000 per month account" in premiums. When asked how he arrived at that estimate, Chatterley explained that Vapor Authority had been one of his accounts at Route.

Defendants do not dispute these facts. They instead contend the evidence is immaterial

because Chatterley was entitled to use his personal knowledge and there is no evidence he physically took anything from Route. Neither argument creates a genuine dispute concerning breach.

Chatterley did not merely apply general knowledge concerning the shipping protection industry. He used his knowledge of the approximate premium revenue associated with a particular Route account while OrderProtection was pursuing that account. And he expressly attributed that knowledge to his work with the merchant at Route. Merchant specific financial information of that nature falls within the Agreements' protection of Route's confidential customer and financial information. Accordingly, Route is entitled to partial summary judgment that Chatterley breached his confidentiality obligations.

Route's nonsolicitation theory against Chatterley presents a different question. Chatterley left Route on November 22, 2021, and his one-year restriction therefore expired November 22, 2022. The Vapor Authority solicitation occurred on March 23, 2023, and cannot itself establish breach of that provision.

Route also relies on Chatterley's testimony acknowledging that he solicited former Route employees. But the testimony does not establish when those solicitations occurred or whether the individuals remained Route employees when Chatterley solicited them. Nor does Chatterley's statement during his deposition that "it appears that I violated" the provisions resolve these questions. Whether his conduct violated the agreement depends upon the underlying facts and the agreement's terms, not Chatterley's characterization of the legal effect of his conduct. Because the record does not establish that the otherwise qualifying solicitation occurred during the restricted period, Route's motion is denied as to breach of Chatterley's nonsolicitation provision.

Route also contends that Chatterley breached his agreement by disparaging Route or making false representations concerning Route's business. Route points to evidence that OrderProtection represented that it maintained a legally compliant insurance captive and that its response times and attachment rates compared favorably to Route's. The evidence further reflects that Chatterley understood that OrderProtection had not completed or funded a captive and that, to his knowledge, Route was the only company in the relevant market operating a captive. That evidence, however, does not establish as a matter of law that Chatterley himself made, directed, or otherwise participated in the allegedly disparaging representations. On this record, a factual dispute remains concerning Chatterley's participation in the challenged statements.

*Perkins*

The evidence concerning Perkins presents a closer factual question. At Route, Perkins served as a Senior Product Manager. His responsibilities exposed him to Route's merchant onboarding, third party integrations, financial models, premium collection, and merchant funded and hybrid funding models. After joining OrderProtection, Perkins worked on a later version of OrderProtection's merchant portal and its hybrid pricing solution.

Route contends the similarities of Perkins's work, coupled with his extensive access to Route's information, established that he used Route's confidential information. Defendants maintain that Perkins merely applied the product development expertise and industry knowledge he acquired through his employment.

The evidence permits competing reasonable inferences. A factfinder could infer that Perkins used protected Route information in developing similar products for OrderProtection. But a factfinder could also conclude that Perkins merely applied the general knowledge and

product development experience he acquired through his work at Route. Unlike the evidence concerning Lefrandt and Chatterley, Route has not identified comparably direct evidence of Perkins using a particular piece of Route's information for OrderProtection's benefit. These competing inferences preclude summary judgment for either party.

Route separately contends that Perkins breached the nonsolicitation provisions of his CIIA, NDA and Separation Agreement by indirectly soliciting Route's merchants. Route concedes that Perkins did not personally solicit merchants in a sales role. Instead, it argues that Perkins indirectly solicited them by developing the OrderProtection product that its sales personnel later marketed to Route customers.

Developing a product, without more, is not the same as soliciting a customer. Accepting Route's theory would effectively transform the nonsolicitation provision into a noncompetition covenant by treating any employee who materially assists a competitor's business as having indirectly solicited its customers. Route identified no evidence that Perkins personally contacted merchants, directed particular solicitation efforts or otherwise participated in soliciting specific Route customers. This evidence therefore does not establish breach of Perkins's nonsolicitation obligations.

*Clark*

The evidence concerning Clark likewise permits reasonable competing inferences. Clark had access to Route's merchants, billing, revenue, and other financial information and participated in developing Route's financial and billing processes. After joining OrderProtection, Clark worked on similar issues and assisted OrderProtection in addressing problems comparable to those Route had encountered during its earlier development. Route contends that Clark used Route's confidential information in doing so. Defendants maintain that

Clark took no Route documents and used only the skills and experience he acquired during his employment.

The evidence permits an inference that Clark used protected Route information, but it does not compel one. A reasonable factfinder could instead conclude that Clark relied upon the skills, knowledge, and experience acquired through his prior employment. Resolution of those competing inferences requires weighing the evidence, which the court may not do at summary judgment. Route's motion for partial summary judgment as to Clark is therefore denied.

*Steele*

Route claims against Steele arise under his confidentiality obligations and Noncompetition Agreement. "For a restrictive employment covenant such as a Noncompete Clause to be valid, it must satisfy the following requirements: '(1) the covenant be supported by consideration; (2) no bad faith be shown in the negotiation of the contract; (3) the covenant be necessary to protect the goodwill of the business; and (4) it be reasonable in its restrictions as to time and area.'" *Systemic Formulas, Inc. v. Daeyoon Kim,* 2009 WL 4981631, at *3 (D. Utah Dec. 14, 2009). In determining reasonableness, Utah courts consider: '"[1] [g]eographical extent; [2] the duration of the limitation; [3] the nature of the employee's duties; and [4] the nature of the interest which the employer seeks to protect such as trade secrets, the goodwill of his business, or an extraordinary investment in the training or education of the employees.'" *First Am. Title Ins. Co. v. Nw Title Insurance Agency, LLC,* 2016 WL 6902473, at *17 (D. Utah 2016).

Defendants first contend the Noncompetition Agreement is unenforceable because Steele received no new consideration when he executed it. However, Utah law recognizes continued at-will employment as sufficient consideration for a restrictive covenant. *See System Concepts*, 669 P.2d at 426. Defendants therefore are not entitled to judgment as a matter of law based on lack of

consideration.

Defendants separately contend Steele was engaged in a common calling and therefore could not validly be restricted from taking another customer support position. However, Defendants have not shown that Steele's position was an ordinary and undistinguished calling. Steele progressed through product support and leadership position, managed approximately eight to fifteen employees, developed training and mentoring programs, trained Route's customer service personnel, participated in employee development processes, and had access to information concerning Route's merchants, claims practices, customer response procedures and competitive information concerning OrderProtection.

Nor does the covenant prohibit Steele from using his general customer service skills in the marketplace. As relevant here, it restricts him for twelve months from developing or substantially contributing to a business providing shipping protection or otherwise directly competing with Route within Utah County and Salt Lake City County. Given Steele's leadership responsibilities and his access to Route's confidential business and competitive information, Defendants have not established that the covenant restricts Steele from pursuing an ordinary occupation using generally marketable skills. Accordingly, Defendants have not shown as a matter of law that the covenant is unenforceable under the common calling doctrine.

The undisputed evidence also establishes breach. Steele left Route in August 2023 and began working for OrderProtection less than one week later. At OrderProtection, he managed client relationships and customer service operations, and trained customers concerning OrderProtection's dashboard. Those activities constitute a substantial contribution to a business directly competing with Route within the meaning of the Noncompetition Agreement. Route is entitled to partial summary judgment that Steele breached his Noncompetition Agreement.

Route separately contends that Steele breached his confidentiality obligations by disclosing information concerning Route personnel and identifying Route merchants for OrderProtection to target. The evidence concerning those theories is less clear. Steele disputes at least some of the merchant evidence, including whether he actually produced a list of Route merchants, and characterizes his statement that he "slapped down a list" of brands OrderProtection should take from Route as a joke. Those factual disputes preclude partial summary judgment for Route on those theories.

*Causation and Damages*

The court's determination that Route has established certain breaches does not resolve Defendants' motion for summary judgment. Defendants seek judgment on Route's contract claims in their entirety and contend that, even assuming breach, Route cannot establish that the alleged breaches caused compensable damages.

Defendants argue that damages for breach of contract must be established with reasonable certainty and cannot rest on speculation or conjecture. According to Defendants, Route has not identified which customers it lost because of a particular breach or how much revenue Route lost as a result. Defendants further contend that although lost profits may constitute an appropriate measure of damages for breach of noncompetition, nonsolicitation, or nondisclosure obligations, OrderProtection's profits cannot substitute for proof of Route's own loss without some correspondence between the two.

Route responds that Defendants' argument is premature because damages require expert analysis. Route identified three general categories of damages: lost revenue from merchants allegedly diverted from Route to OrderProtection, initially calculated at approximately $825,000 through November 2024; OrderProtection's profits from merchants allegedly diverted from

Route and harm to Route's market position, reputation and goodwill, and first-mover advantage. Route further explains that Defendants designated relevant financial materials and merchant identities Attorney's Eye Only and that expert discovery had not concluded when the parties filed the present motions. The need for expert analysis may explain why Route cannot yet establish the precise amount of its alleged losses. But uncertainty concerning the amount of damages is different from whether Route has produced evidence from which a factfinder could conclude that the alleged breaches caused it injury.

Viewed in Route's favor, the record contains sufficient evidence to create a genuine dispute on that question. Route has presented evidence that former employees allegedly used protected information, solicited Route merchants, and assisted a direct competitor in pursuing Route's business. Route has also identified lost merchant revenues and competitive harm as resulting injuries. Taken together, that evidence permits an inference of causation and injury, even though it does not compel one.

Defendants separately argue that Route's damages disclosure is inadequate under Rule 26(a)(1)(A)(iii). Route disclosed lost revenue from allegedly diverted merchants, OrderProtection's profits attributable to diverted merchants, and harm to Route's market position and goodwill, while explaining that further calculations depended upon expert discovery. Defendants contend these disclosures lack the required computation and that Route cannot avoid summary judgment by relying on anticipated expert testimony. Any inadequacies in Route's damages disclosures do not on the present record establish the absence of an essential element of its contract claims. Whether Route satisfied Rule 26 and if not, whether a disclosure failure warrants exclusion or another remedy, is analytically distinct from whether the summary judgment record permits a reasonable factfinder to find causation and injury.

Nor does Route's reliance on unfinished expert discovery itself provide a basis to deny Defendants' motion. Defendants' motion fails for a different reason: the existing evidence, viewed in Route's favor, is sufficient to permit a reasonable juror to find that at least some of the alleged contractual breaches caused Route's compensable harm. Accordingly, genuine disputes of material fact remain concerning causation and damages.

**Permanent Injunction**

Route seeks a permanent injunction prohibiting Defendants from using its confidential information and prospectively enforcing the restrictive covenants contained in the Agreements. "A permanent injunction may be awarded if a party demonstrates '(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.'" *DP Creation, LTD. Liab. Co. v. Suzhou Huimeiyang Info. Tech. Co. (LI SU),* 2024 WL 3822897, at *9 (D. Utah Aug. 14, 2024). A permanent injunction is an extraordinary remedy and does not flow automatically from a contractual violation. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

"A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Awad v. Ziriax*, 670 F.3d 1111, 1113 (10th Cir. 2012) (quoting *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,* 269 F.3d 1149, 1156 (10th Cir. 2001)). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Schrier v. University of Colorado*, 467 F.3d 1253, 1267 (10th Cir. 2005).

The court grants Route partial summary judgment insofar as the undisputed evidence establishes breach by Wilson and the Employee Defendants of certain contractual provisions.

However, other elements of those claims remain unresolved. Route has not established complete liability or actual success on the merits. Route likewise has not established actual success on its trade secret claims.

Moreover, Route has not established that monetary damages would be inadequate to remedy any injury ultimately proven. Its asserted losses principally concern identifiable merchants, employees and competitive revenue that may be addressed though damages. The contractual provisions characterizing certain breaches as irreparable do not eliminate Route's obligations to establish that legal remedies are inadequate. This court previously concluded, when denying preliminary relief, that Route's loss of merchants and employees could be valued through monetary damages. The present record does not warrant a different conclusion.

Because Route has not satisfied these necessary requirements, the court need not address the remaining permanent injunction factors, the possible application of Rule 65(d)(2) to OrderProtection, or Route's request to extend the expired restrictive periods. Route's request for a permanent injunction is denied.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is DENIED. Plaintiff's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART. The court concludes that Defendant Wilson breached Route's Terms and Conditions, Defendant Lefrandt breached his confidentiality obligations, Defendant Chatterley breached his confidentiality obligations and Defendant Steele breached his Noncompetition Agreement. The remaining disputed breaches, together with whether any proven breach caused Route compensable injury and the amount of any resulting damages, remain for determination by the factfinder. Within fifteen days of the date of this Order, the parties shall meet and confer and

submit a joint notice with the court as to when they will be ready for trial. The court will then review its trial schedule and notify the parties of specific trail dates that are available. The court will issue a Trial Order with pre-trial deadlines approximately ten weeks prior to trial.

DATED this 24th day of August 2026.

BY THE COURT:

DALE A. KIMBALL,
United Sates District Judge